UNITED STATES of America, Appellee,

v.

Constantine T. KEPREOS,
Defendant, Appellant.

No. 84–1051.

United States Court of Appeals,
First Circuit.

Argued Nov. 8, 1984.

Decided March 29, 1985.

Rehearing and Rehearing En Banc
Denied April 26, 1985.

Joan A. Lukey, Boston, Mass., by appointment of the court, with whom Hale & Dorr, Boston, Mass., was on brief, for defendant, appellant.

Brackett B. Denniston, III, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, McGOWAN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TORRUELLA, Circuit Judge.

In his second trial, after the first ended in mistrial, a jury found appellant Constantine T. Kepreos guilty of two counts of mail fraud in violation of 18 U.S.C. § 1341 and two counts of Commodity Exchange Act violations under 7 U.S.C. §§ 13(b) and 6o(1). The government charged appellant and others with engaging in a scheme to defraud investors who had purchased interests in commodity pools operated by two companies, Northeast Investment Services, Inc. (NIS) and Boston Trading Group, Inc. (BTG), both of which were partially owned by appellant.

The indictment alleged that defendants had mailed fraudulent sales literature, and "churned" commodity pools operated by NIS and BTG.[1] Counts in the first category pertained primarily to Northeast, and those in the second primarily to BTG.

Appellant's first trial began on June 13, 1983. His principal defense was that he

was unaware of the fraudulent schemes alleged by the government, and that he could not have been expected to recognize them due to certain organic and psychological deficiencies that he suffered. As a result of these alleged deficiencies, he claimed that he lacked the specific intent necessary to support a conviction. After a five-week jury trial, a mistrial was declared because the jury was unable to reach agreement on a verdict.[2]

A second jury trial commenced on October 3, 1983. The government presented forty-seven witnesses and over one hundred and seventy-five exhibits, numbering in the thousands of pages. Appellant called fourteen witnesses and testified in his own defense. The jury found appellant guilty of two counts of mail fraud as to the NIS scheme and two counts of fraud in violation of the Commodity Exchange Act in connection with the BTG scheme. He was acquitted on nine other counts dealing with both schemes, and the jury reported that it was unable to reach an agreement as to three other counts. On January 9, 1984, appellant was sentenced to eighteen months imprisonment and a three-year term of probation.

This appeal essentially arises from the trial court's rulings in four areas: the exclusion of expert psychiatric and psychological testimony offered by appellant; the exclusion in the second trial of a record, admitted in the first trial, that a codefendant who testified for the government had once pleaded guilty to a charge of accepting a bribe as a witness; the denial of appellant's motion seeking that immunity be given to a witness; and, finally, denial of appellant's motion to dismiss the indictment and, otherwise, failure to provide adequate curative actions against alleged pros-

---

* Of the District of Columbia Circuit, sitting by designation.

1. The practice known as "churning" is the excessive trading for the primary purpose of obtaining commissions without significant regard to whether the investor realizes a profit or not. See Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 324 (5th Cir.1981); Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 549 (2d Cir.1977);

see also Horne v. Francis du Pont & Co., 428 F.Supp. 1271, 1274 (D.D.C.1977).

2. Fifteen counts of the indictment were dismissed at the close of arguments. The jury acquitted appellant on the only wire count left, and was unable to reach a verdict as to the remaining counts.

ecutorial misconduct in connection with the prosecutor's contacting of jurors after the first trial.

With this background in mind, we turn to appellant's claims.

## I. *Exclusion of Expert Testimony*

Appellant first claims error in the exclusion of expert testimony by the district court. He offered this testimony to show that he suffered from physical and psychological difficulties which adversely influenced his ability to attend to subtle details in his surroundings and to draw conclusions therefrom. The evidence was excluded by the trial court.

Appellant contends that the expert testimony was relevant to the issue of his intent. It was offered, he argues, not to show diminished capacity or lack of capacity to form specific intent, but to present an expert basis for his lack of awareness as to the existence of schemes to defraud. Appellant also contends that because the testimony was exculpatory and critical to his defense, its exclusion violated his sixth amendment right to present a defense and rebut the Government's charges.

 Rule 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It is well established that district courts have broad discretion to exclude evidence under this rule. *United States v. Hooton*, 662 F.2d 628, 636 (9th Cir.1981), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982); *United States v. Medico*, 557 F.2d 309, 317 (2d Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977). Only in excep-

tional circumstances will reversible error be found in the district court's determination of the probative value of testimony in a particular case. *United States v. Schmidt*, 711 F.2d 595, 599 (5th Cir.1983), *cert. denied*, ── U.S. ──, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984). Besides, a wide assortment of relevant evidence is, constitutional arguments notwithstanding, deliberately excluded by trial courts by reason of counterbalancing factors that are believed to be of greater moment than the unfettered admission of relevant testimony. *See Wahrlich v. State of Arizona*, 479 F.2d 1137, 1138 (9th Cir.) (per curiam), *cert. denied*, 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973); *see also United States v. Schmidt, supra.*

With these principles as a framework, we first note that appellant was capable of forming the intent required by the statutes under which he was prosecuted. Kepreos did not rely on an insanity defense, and the evidence in question was allegedly not offered to prove either diminished capacity or lack of capacity to form specific intent. In other words, he did not question his capacity to form intent but nonetheless was interested in having the jury receive psychiatric evidence on such issue.

 We find psychiatric testimony in these circumstances to be both misleading and of questionable utility.[3] The district court, therefore, correctly excluded the evidence. *United States v. Castell*, 584 F.2d 87, 89 (5th Cir.), *cert. denied*, 440 U.S. 925, 99 S.Ct. 1256, 59 L.Ed.2d 480 (1978).[4]

 Next, appellant argues that the trial court erred in rejecting the proffered testimony as evidence of character or personality traits under Fed.R.Evid. 404(a)(1) and 405(a). In his view, expert testimony would have shown that he had the follow-

---

3. Both experts had testified on voir dire that appellant had full capacity to deceive, lie, and to control his conduct. Moreover, the relationship between the experts' findings and the capacity to form intent was described as speculative by the psychiatric expert.

4. We also note that other Circuits have rejected psychiatric testimony when offered not in connection with an insanity defense, but to support a defense of diminished capacity. *See Campbell v. Wainwright*, 738 F.2d 1573, 1582 (11th Cir. 1984); *Muench v. Israel*, 715 F.2d 1124, 1142–44 (7th Cir.1983), *cert. denied*, ── U.S. ──, 104 S.Ct. 2692, 81 L.Ed.2d 878 (1984).

ing "personality traits": avoidance, denial, repression, naivete, dependency, and tunnel vision.

The term "character trait" is nowhere defined in the Federal Rules of Evidence. There is no indication whatsoever that either the draftmen or Congress had in mind admitting evidence of broad psychological traits or clinical states such as "repression" or "dependency" or the other similar characteristics about which appellant's experts proposed to testify, perhaps most notably "tunnel vision." The trial judge excluded the testimony on the basis of her legitimate concern that it might confuse the jury, an opinion which we fully share. We are thus satisfied that there was no error below on this point. *See United States v. MacDonald,* 688 F.2d 224, 227–28 (4th Cir.1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983).

Appellant's third point with respect to the exclusion of expert testimony relates to the jury instructions given at trial. The court had instructed the jurors that an intent to defraud could be based on a finding of either positive knowledge of events, or a deliberate indifference to them. Nonetheless, appellant contends, the court refused to allow expert testimony that could have rebutted the charge that he was deliberately indifferent. On the basis of the admissible evidence presented, we find that the trial court gave the jury correct instructions on the issue of specific intent. *See United States v. Brien,* 617 F.2d 299, 312 (1st Cir.), *cert. denied sub nom. Labus v. United States,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). Since the trial court thus acted well within the parameters imposed upon it by the law, we cannot find a violation of constitutional rights in the combination of the district court's valid judgment on proffered evidence and the charge given on the issue of intent.

## II. *Other Evidentiary Claims*

In 1976, appellant's codefendant, Richard Shaw, pleaded guilty in a Florida state court to the crime of accepting a bribe as a witness. Adjudication of guilt was with-

held pursuant to a procedure established by a Florida statute. *See* West's F.S.A. Sec. 948.01(3). The district court refused to admit evidence of the Florida plea despite appellant's contention that it was relevant to challenge Shaw's credibility. Appellant claims the court committed reversible error in limiting his cross-examination of this witness.

Trial courts are granted broad discretion to determine the scope and extent of cross-examination. *United States v. Honneus,* 508 F.2d 566, 572 (1st Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). However, it is fully recognized that the right of a defendant in a criminal case to establish the bias of witnesses against him through cross-examination is an important component of the sixth amendment right to confrontation. *Davis v. Alaska,* 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *United States v. Jarabek,* 726 F.2d 889, 992 (1st Cir.1984). Thus, a trial court may limit cross-examination, but only after there has been permitted a certain threshold level of cross-examination that satisfies the constitutional requirement. *Niziolek v. Ashe,* 694 F.2d 282, 289 (1st Cir.1982). If the jury has sufficient evidence before it bearing on the witness' bias, the court need not permit unending excursions into each and every matter touching upon veracity. *United States v. Fortes,* 619 F.2d 108, 118 (1st Cir.1980).

Under these principles, we see no merit in appellant's argument that the court's decision unduly restricted his constitutional right to impeach the credibility of this witness. Moreover, even if the plea should have been allowed into evidence, we find its exclusion by the district court a harmless error.

First, appellant had abundant opportunity to expose Shaw's motive for testifying and to impeach his credibility generally. Counsel brought out that Shaw had entered into a plea agreement before indictment; that twenty-eight or thirty-one counts against him had been dismissed

(hence reducing his maximum punishment by 140 years); and, that the Government had agreed to recommend no more than five years imprisonment. In addition, the jury had other information on Shaw's major role in the fraud, including his alleged receipt of over $1,000,000. The court gave an accomplice-witness instruction urging the jury to exercise caution as to any such testimony. The only restriction imposed by the district court referred to Shaw's plea. Under these circumstances, the court did not deny appellant "the constitutionally required threshold level of inquiry" into a government witness' motivation for testifying. *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982).

Second, Shaw's testimony was in any event only corroborative in that a great deal of evidence from other sources was presented on the same issues that Shaw referred to in his testimony. We thus are convinced that the judgment was not substantially swayed by any potential error and that, if in fact there was an error, it had but slight effect on the jury.

## III. *Pullen's Testimony*

At trial, appellant sought to offer the testimony of Robert B. Pullen, the President and Chief Financial Officer of First Pullen Commodity Services, Inc. (First Pullen). First Pullen was the futures commission firm responsible for executing commodities transactions for BTG and NIS. Pullen was the individual at First Pullen who received and transmitted trade orders from and to NIS and BTG.

Anticipating that Pullen would assert his Fifth Amendment privilege against self-incrimination during appellant's trial, appellant's counsel requested that the Government grant immunity to Pullen. Having been denied this request, appellant's counsel filed a motion in the district court asking the court either to immunize Pullen, to order the Government to grant Pullen use immunity, or to dismiss the indictment with prejudice. The court rejected these alternatives. Nevertheless, appellant was given the opportunity to read into the record testimony given by Pullen before a grand jury in previous proceedings. This testimony was substantially equivalent to that which the appellant had sought to elicit at trial by putting Pullen on the witness stand.

Appellant argues that the failure to immunize Pullen amounted to a denial of due process rights and the right to "compulsory process for obtaining witnesses in his favor" as granted by the sixth amendment. In appellant's view, he was further deprived of due process because of governmental selectiveness in its granting of immunity to other witnesses. This, he claims, rendered the trial fundamentally unfair because it allegedly resulted in the presentation to the jury of only a misleading portion of the whole story. Appellant also contends that said unfairness was later magnified when the Government argued to the jury that Pullen's grand jury testimony should not be given as much weight as the testimony of a live witness.

The fact that Pullen was not given immunity did not prejudice appellant. Pullen provided the same testimony to the grand jury that appellant sought for his own trial. This evidence, albeit read into the record, was admitted at trial. The jury was not deprived of considering the allegedly essential and exculpatory information in appellant's favor. Thus, the judicial fact-finding process has not been rendered unfair because of the absence of Pullen's live testimony. *See United States v. Alessio*, 528 F.2d 1079 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

Furthermore, we cannot conclude that the trial was rendered unfair by the prosecutor's comment that live testimony was more reliable than the written transcript of Pullen's grand jury testimony. Although the comment was less than politic, any difficulty in this regard was corrected when the court gave the jury prompt curative instructions to which appellant did not object. In light of the court's alert and appropriate instructions,

we find no prejudice to appellant in the comment by itself or in its allegedly cumulative effect upon the factual image presented to the jury throughout the trial, particularly when considered against a backdrop of overwhelming evidence against appellant.

## IV. *Prosecutorial Misconduct*

According to appellant, unbeknownst either to the trial court or to the defense, the Assistant U.S. Attorney contacted at least one of the first trial jurors and learned the purported numerical split, the identity of the jurors who were not persuaded beyond a reasonable doubt, and, further, their reasons for having been unwilling to convict appellant in the first trial.

It was not until the fourth day after the impanelment of the jury in the second trial that the government disclosed the substance of the information in question. By that time, however, the following had already taken place: the impanelment of the jury; opening statements from the parties; the complete direct and cross-examination of one government witness; and, finally, the completion of the direct examination of another. Moreover, after the jury was initially impaneled and excused for the day, the court raised the matter of sharing the information gained by the government, but to no avail. Defense counsel then stated the need for dismissal, pointing out that appellant would never be able to overcome what she called the "unfair advantage" gained by the government in the jury-selection process and the first three days of the trial.

Appellant contends that this "unfair advantage" deprived him of any opportunity for a fair trial. He urges us to either dismiss the indictment or reverse the conviction and remand the case with appropriate limitations placed on prosecutorial conduct.

We start with the proposition that henceforth this Circuit prohibits the post-verdict interview of jurors by counsel, litigants or their agents except under the supervision of the district court, and then only in such extraordinary situations as are deemed appropriate. Permitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties. *See United States v. Moten,* 582 F.2d 654, 665–67 (2d Cir.1978); *Miller v. United States,* 403 F.2d 77, 82 (2d Cir.1968); *Rakes v. United States,* 169 F.2d 739, 745–46 (4th Cir.1948); *Commonwealth v. Fidler,* 377 Mass. 192, 202–03, 385 N.E.2d 513, 519–20 (1979). Such outcomes, or even the appearance of the same, we are not willing to tolerate. Thus, future incidents like the one described above will not be countenanced.

The issue here, however, is whether in the present context the retroactive application of the rule we have just announced should warrant reversal or dismissal.

Ordinarily, questions concerning the ethical behavior of prosecutors are presented in the context of an appeal by a defendant who complains that an impropriety rendered his conviction invalid. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (failure to disclose exculpatory evidence); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (knowing use of false testimony at trial); *United States v. Basurto,* 497 F.2d 781 (9th Cir.1974) (use of perjured testimony to procure indictments). Where such a basis for the allegations is proven, and the misdeeds are thus found to have impugned the fundamental fairness of the trial, precedent authorizes reversal of the conviction and remand for a new trial. *See Brady v. Maryland, supra.* The dismissal of the indictment has been invoked only in egregious or extreme circumstances. *Ramos Colón v. U.S. Attorney for District of Puerto Rico,* 576 F.2d 1, 4 (1st Cir.1978). Such circumstances are not before us in the present case, particularly when we consider

that the prosecutor did not violate any rule in effect at the time of his actions.[5]

█ Juror contacts in the instant case did not cause any prejudicial evidence to be admitted at trial or any exculpatory evidence to be suppressed from it. Also, defense counsel received a disclosure of the information possessed by the government, even if somewhat tardily. Although such disclosure took place on the fourth day of the trial, the trial lasted six weeks and involved more than 60 witnesses. In addition there is no evidence that contacts with jurors from the first trial resulted in a prejudiced or biased jury for the second trial. Consequently, as a matter of demonstrable reality, the contacts in question did not impugned or distort the fairness and integrity of the judicial fact-finding process in such a way as to warrant, as pressed by appellant, either a reversal or dismissal of the indictment. The trial court therefore, committed no reversible error.

For the reasons stated, the district court is *affirmed.*

5. In the Commonwealth of Massachusetts the applicable rule is set out in Massachusetts Supreme Judicial Court Rule 3:07, DR7–108(D), as follows:

> After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated to harass or embarrass the juror or to influence his actions in future jury service.

Subsequent to the effective date of this rule, the Supreme Judicial Court held in *Commonwealth v. Fidler*, 377 Mass. 192, 203, 385 N.E.2d 513, 520 (1979) that "counsel, litigants, and those acting for them may not independently contact jurors after a verdict is rendered." It reasoned

> We think the jury system is best protected by a rule requiring that any post-verdict interviews of jurors by counsel, litigants, or their agents take place under the supervision and direction of the judge. We decline to permit unrestricted post-trial interviews, as we think such a practice would defeat the important interests protected by restrictions on the use of juror testimony to impeach verdicts. Moreover, permitting unbridled interviews of jurors could lead to harassment of jurors, exploitation of jurors' thought processes, and diminished confidence in jury verdicts. See

*United States v. Moten,* 582 F.2d 654, 664–665 (2d Cir.1978); 51 A.B.A.J., *supra* at 158. *Id.* at 202, 385 N.E.2d at 519.

Appellant argues that this decision is a gloss on DR7–108(D), and that because the United States District Court for the District of Massachusetts Local Rule 5(d)(4)(B) adopts as its guide for professional conduct in this case the Massachusetts Code of Professional Responsibility, "as amended from time to time by [the highest court of the commonwealth]," the prosecution here violated both state and federal court ethical standards. However, the Supreme Judicial Court did not cite to DR7–108(D) in *Fidler,* so the federal prosecutor could have believed that *Fidler* applied only to conduct in the state court, and that he was bound only by the language of DR7–108(D), which does not expressly mention seeking prior permission before jury interviews, *see, e.g., Annotated Code of Professional Responsibility* 368 (ABA Found. 1979); *Professional Responsibility* 163 (ABA 1978). In view of the lack of clarity, we shall give the prosecution the benefit of the doubt in this case, while making clear that we concur in the rationale of *Fidler* and will expect counsel to adhere to that rule in the future, not only in the District of Massachusetts and Puerto Rico where there are requirements to this effect in the local courts, but also in the other districts within this circuit.