USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1703

 UNITED STATES,

 Appellee,

 v.

 ROBERT J. ROWE,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert E. Keeton, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 Bownes, Senior Circuit Judge,
 and Stahl, Circuit Judge.
 
 

 Stephen B. Hrones with whom Hrones & Garrity was on brief for
appellant.
 Mark J. Balthazard, Assistant United States Attorney, with
whom Donald K. Stern, United States Attorney, was on brief for
appellee.

May 8, 1998

 
 

 STAHL, Circuit Judge. On May 29, 1996, a grand jury
indicted defendant-appellant Robert Rowe on three counts of
bankruptcy fraud under 18 U.S.C. 152. Count I charged him with
fraudulently concealing his interest in a home construction
business known as Elegant Design, Inc. ("EDI"). Counts II and III
charged him with making false statements in two of the bankruptcy
schedules attached to his chapter 7 bankruptcy petition. Following
an eleven-day trial, a jury acquitted Rowe on Count I but convicted
him on Counts II and III. Subsequently, the district court
sentenced Rowe to 33 months in prison, but stayed execution of the
sentence pending appeal.
 Rowe claims an entitlement to a new trial on Counts II
and III because the district court mishandled two situations
precipitated by messages the court received from jurors during the
trial. Alternatively, Rowe contends that the court erred in
denying his Fed. R. Crim. P. 29 motion for a judgment of acquittal
on Count III, in calculating the loss he intended to cause his
creditors by perpetrating the frauds, and in imposing three upward
adjustments to his offense level before determining the appropriate
guidelines sentencing range. Finally, Rowe complains about the
court's decision to keep confidential a letter it received from a
juror after the verdicts but prior to sentencing. We affirm the
conviction on Count II, reverse the conviction on Count III, and
remand for resentencing.
 I.
 We confine our factual recitation to those matters
relevant to the disposition of Rowe's appeal, construing any
disputed facts in a light most favorable to the verdicts. SeeUnited States v. Wihbey, 75 F.3d 761, 764 (1st Cir. 1996).
A. Rowe's False Statements 
 For years, Rowe and his brother, Ronald Rowe, ran a home
construction business called Rowe & Rowe, Inc. ("RRI"). In 1989,
Rowe and his brother suffered a number of serious financial
setbacks. As a result, the brothers discontinued doing business as
RRI, and Rowe caused another company he controlled, Senator
Construction, Inc., to file for bankruptcy. That same year, the
brothers created EDI. EDI, which was nominally owned by Howard
"Sonny" Fisher, a friend of Rowe's, engaged in the same business as
had RRI.
 In September 1992, Rowe filed a personal bankruptcy
petition under chapter 7 of the Bankruptcy Code. Doing so
obligated him to file with the bankruptcy court a number of
bankruptcy schedules that are designed to profile a chapter 7
petitioner's financial situation. In Schedule A, which directs the
petitioner to list all interests in "REAL PROPERTY," Rowe typed
"NONE" in the column where he was asked to provide a "Description
and Location of Property." In Schedule J, which is labeled
"CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)," Rowe typed
"$395.00" in the space he was to list his "Rent or home mortgage
payment." These two responses were the subjects of the bankruptcy
frauds charged in Counts II and III of the indictment. 
 The government's theory as to Count II was
straightforward: the answer "NONE" in Schedule A was fraudulent
because, at the time Rowe filed his petition, he and his ex-wife
each had a 50 percent ownership interest in a residence located at
20 Highland Avenue in Nahant, Massachusetts. The government's
theory as to Count III is a bit more complicated, see infra at 15-
22, but can be summarized as follows: the answer "$395.00" in
Schedule J was fraudulent because, at the time Rowe filed his
petition, EDI was paying upwards of $1800 per month in rent for
Rowe to live in a house he personally had leased. This house was
located at 47 Castle Road in Nahant, Massachusetts. In the
government's view, Rowe had a clear obligation to disclose this
rent payment on his Schedule J, but failed to disclose it in order
to further the fraud charged in Count I (the charge of which the
jury acquitted him): concealing his interest in EDI from the
bankruptcy court. 
 Rowe defended the statement charged in Count II on the
basis that, although he technically did own half of the Highland
Avenue residence, he had no "beneficial interest" in it because it
was encumbered with a $50,000 mortgage and attachments in the
amount of $1.8 million, and because he had an agreement with his
ex-wife that she would get the equity (if any) that remained in the
residence following sale of the property. Rowe defended the
statement charged in Count III on two bases: (1) because EDI was
paying the $1800 monthly rental payment on the Castle Road property
pursuant to a loan agreement Rowe had with the company, Rowe was
not obligated to list the payment as a current personal
expenditure; and (2) because Schedule J asked Rowe to list only his
"rent or home mortgage payment" (emphasis supplied), and because
Rowe's response of "$395.00" truthfully set forth his home mortgage
payment, Rowe's answer to this (arguably) disjunctive inquiry was
truthful. Rowe supported this latter argument by testifying that
his monthly mortgage payment on the Highland Avenue property was
$395.00 (not including late payment charges).
B. Juror Communications
 Three days into the government's case-in-chief, one of
the jurors ("Juror A") contacted the court clerk and asked: "When
we're polled, do we have to face each of the lawyers?" Presumably
because a jury poll would only follow a conviction, Rowe's counsel
was concerned that Juror A had already decided the case against his
client and asked the district court to inquire into the matter. 
The court obliged by summoning the juror to the sidebar, telling
him that he might not even be polled, and asking whether there was
some particular reason he was interested in the polling process. 
Juror A responded: "No. I mean, I was just curious what who
does it and how it happens, when it happens, if it happens. I
don't really know much about the courtroom." After the court
pressed a bit further and asked why he was concerned about the
polling process, the juror elaborated:
 Um, I don't know. I mean, if I I'm not
 really sure, but I know that I mean, the way
 things are going, I don't know who you know,
 how I don't know. I mean, really I don't
 really have an answer, but I feel that I'd
 like to know how the proceedings are going to
 end. I mean, I yeah, I don't know how to 
 it's just a concern. That's all.

The court then asked Juror A whether his concern would "in any way
impede or impair [his] impartial consideration of the case," and
the juror assured the court that his evaluation of the case would
be impartial.
 After Juror A returned to the jury room, Rowe's counsel 
complained that the court had not asked him why he was concerned
about facing the lawyers while being polled. The court then
summoned the juror back to the sidebar and asked him why he
harbored such a concern. Juror A responded: "Um, I don't know. 
It seemed like they're hard on the witnesses. That's what my
question is. I mean, I don't know you know, we can only go by
the facts, so you know, and we'll all know what those are." 
Subsequently, Rowe's counsel challenged Juror A for cause, arguing
that he was the only lawyer who had been hard on the witnesses to
that point, that the juror's answers reflected both sympathy for
the government's witnesses and a predisposition to convict, and
that the juror's answers also demonstrated a disqualifying 
"mental[] deficien[cy]." The court rebuffed the challenge, finding
no basis for an inference that Juror A had already made up his mind
and observing that "[w]hen attorneys choose their method of dealing
with witnesses, [they] do it in the presence of the jury, [they]
take risks, [they] deliberately take those risks, and that . . .
that there is some reaction to that is not a basis for a challenge
for cause."
 On the same day as the incident involving Juror A, a
second juror ("Juror B") informed the court clerk that she wished
to speak with the district court. In the presence of counsel,
Juror B (an occupational health worker) told the court:
 I was talking to a co-worker last night
 at my job who was just filling in on my
 patients and I guess she was covering one of
 my patients. I had never talked about the
 case, but she knew I was at a federal criminal
 case and I'd be back in two weeks to go back
 to work. And I guess one of the patients she
 was covering, the family said: "Oh, I wonder
 if she's on the Rowe case." And when she told
 me that I said: "I can't discuss" I said: 
 "No, but I can't discuss any case that I'm
 doing," and that was it. 
 And then it wouldn't affect my
 impartiality, but I felt like I should report
 it.

The court then asked the juror if she could identify the patient by
name, which she did. At this point, Juror B also told the court
that she had treated the patient for about a week prior to being
called for jury duty, and that she had never discussed anything
with the patient other than her treatment. After Juror B returned
to the jury room, Rowe's counsel informed the court that the
patient in question was Rowe's current wife's grandmother. When
the court asked all counsel present if they wanted it to probe
further into the matter, they all declined the invitation.
 Yet one week after the verdicts were returned, Rowe filed
a motion for a new trial, alleging misconduct on the part of Juror
B. Rowe claimed that, at the time of the events just described,
Juror B knew that her patient was related to Rowe by marriage, but
did not disclose her knowledge to the court. In support of this
claim, Rowe submitted an affidavit from his wife to the effect that
Mrs. Rowe had been present in the first row of the spectator
section of courtroom throughout the trial; that, after the trial,
Mrs. Rowe had happened upon Juror B in her grandmother's room; that
Juror B had expressed no surprise at seeing Mrs. Rowe; that, when
Mrs. Rowe asked Juror B if she knew her, the juror replied that
"she was not sure;" that when Mrs. Rowe identified herself, Juror
B said that "she really didn't know" her; and that Mrs. Rowe had
learned after the first day of trial (and therefore prior to the
juror's disclosure to the court) that the juror had been caring for
her grandmother. Rowe also asked the district court to call Juror
B in for further questioning.
 The district court held a hearing on Rowe's motion,
during which it asked Rowe's counsel why, prior to the verdicts,
counsel had elected not to have the court question Juror B about
whether she knew of the relationship between Rowe and her patient. 
Rowe's counsel replied that doing so would have been "dangerous"
because "[o]nce that question was asked, she would have been off
the jury." When the court asked why, Rowe's counsel explained that
the way he would have had to ask the question "Do you realize
that your patient is the grandmother of the wife of the defendant?"
 would have tainted the juror by informing her of the nature of
the relationship. The court disagreed, opining that Juror B would
have been disqualified only if knowing the nature of the
relationship would somehow have precluded her from "sit[ting]
fairly and impartially on the issues in this case." Following a
continuance and after hearing from the co-worker who initially had
asked Juror B if she was sitting on the Rowe case, the court
declined to call the juror in for questioning and denied Rowe's
motion. In explaining its ruling, the court observed that a
contrary ruling would create incentives for defense counsel to
pursue matters of juror misconduct "only after having waited to see
whether the jury verdict was favorable or unfavorable."
 The final juror communication appears to have occurred
after the verdicts but prior to sentencing. Following the
imposition of sentence at the sentencing hearing, Rowe's counsel
asked the court why it had not placed into the record a letter that
the court had received from a juror ("Juror C") after the verdicts
had been returned. Counsel did not reveal how he had learned of
the letter; he did, however, evince some familiarity with its
contents, asserting that it was relevant to sentencing. Counsel
then asked the court to make the letter, and the court's response
to the letter, a part of the record. Analogizing to cases
prohibiting counsel from communicating with jurors after a trial,
see, e.g., United States v. Kepreos, 759 F.2d 961, 967 (1st Cir.
1985), the court declined his request "because it is not the
function of a juror to be concerned with the sentencing function." 
Without divulging the letter's contents, the court also stated that
Juror C's views "were not considered by me as relevant [to
sentencing] in any respect."
C. The Sentence
 Because our reversal of Rowe's conviction on Count III
vitiates the district court sentence and requires resentencing, seeinfra at 21-22, we simply sketch the lower court's sentencing
calculations for purposes of placing the remainder of this appeal
into context.
 There was no dispute that each count of conviction
carried with it a base offense level of six. See U.S.S.G. 
2F1.1(a). The district court increased this level by seven because
it found by a preponderance of the evidence that Rowe intended to
deprive his creditors of somewhere in excess of $120,000 when he
engaged in the conduct underlying his two convictions. SeeU.S.S.G. 2F1.1(b)(1)(H) and (I) (directing sentencing courts to
increase the base offense level by seven if the loss caused was
more than $120,000 but less than or equal to $200,000); see alsoApplication Note 7 to U.S.S.G. 2F1.1 (directing sentencing courts
to use intended loss if intended loss is greater than actual loss);
Application Note 8 to U.S.S.G. 2F1.1 (noting that loss
determinations need not be made with precision). The court then
made the following upward adjustments to Rowe's offense level: two
levels for obstructing justice, see U.S.S.G. 3C1.1; two levels
for violating a judicial process or order, see U.S.S.G. 
2F1.1(b)(3)(B); and two levels for more than minimal planning, seeU.S.S.G. 2F1.1(b)(2)(A). These adjustments yielded a total offense
level of 19 and, because Rowe's criminal history category was I, a
guidelines sentencing range of 30-37 months. The court then
imposed the 33-month sentence that is, in part, the subject of this
appeal. 
 II.
 As noted at the outset, Rowe contends that the district
court's mishandling of each of the incidents involving Jurors A and
B provides an independent basis for granting him a new trial on
Counts II and III. Rowe also renews his two arguments regarding
the legal deficiency of Count III, and challenges the legality of
the intended loss determination and of the three upward adjustments
the court made to his base offense level. Finally, though failing
to suggest an appropriate remedy therefor, Rowe takes general issue
with the court's failure to place the letter from Juror C, and its
response to the letter, in the record. We address each argument in
turn.
A. The Incidents Involving Jurors A and B
 Rowe contends that the district court committed
reversible error in denying his mid-trial motion to strike Juror A
for cause. On appeal, he has abandoned his argument that Juror A
lacked the mental capacity to sit on the case; but he continues to
contend that Juror A's "hard-on-the-witnesses" comment demonstrates
that the juror was prejudiced against his lawyer, and that the
entire episode shows that the juror had decided to convict prior to
hearing all the evidence. "Why," Rowe asks, "would a juror not
want to look a defense attorney in the face if he had just
acquitted his client?" We see no reversible error in the district
court's rejection of Rowe's arguments.
 In cases involving possible juror misconduct or bias, the
district court acts with broad latitude in determining the nature
and scope of the inquiry it will conduct into the matter. See,
e.g., United States v. Walsh, 75 F.3d 1, 7 (1st Cir. 1996). Any
findings the court makes as a result of such an inquiry will stand
unless shown on appeal to be clearly erroneous, see, e.g., United
States v. Ortiz-Arrigoitia, 996 F.2d 436, 443 (1st Cir. 1993), and
we will not intervene unless the trial court's denial of a cause-
based challenge to a juror constitutes a "clear abuse," United
States v. McNeill, 728 F.2d 5, 10 (1st Cir. 1984).
 Here, there was no such abuse with respect to Rowe's
challenge to Juror A. Accepting solely for the sake of argument
the factual and legal premises of Rowe's first contention that
Juror A's apprehension about facing the lawyers during polling was
a direct response to Rowe's lawyer's style of interrogation, and
that a defendant is entitled to strike for cause a juror who
becomes prejudiced against him because of his lawyer's courtroom
conduct we nevertheless think the court acted well within its
discretion in declining to strike Juror A. The most that can be
said about Juror A's sidebar comments is that they reflected
concern about Rowe's counsel's style of interrogation and, perhaps,
about being on the receiving end of such aggressive questioning. 
In our view, it simply stretches matters too far to infer from this
that Juror A had become so "prejudiced" against Rowe's counsel that
he had prejudged the case against Rowe. Our conclusion in this
respect is bolstered by the fact that, at the conclusion of the
first sidebar conference, the district court sought and received
assurances from Juror A that the juror was and would remain an
impartial juror. 
 Rowe's more general argument that Juror A would not
have been concerned about the jury poll at all unless he had
already decided to vote guilty similarly rests more on
speculation than on compelled inference. To say that Juror A's
having prefaced his question to the court with the phrase "[w]hen
we're polled" is indicative of an already-made decision to convict
would require us to ignore the larger context: that the juror, by
his own subsequent admission, "[didn't] really know much about the
courtroom" (meaning that he presumably didn't know that a jury poll
only follows conviction). It also would require us to reject as
untruthful Juror A's subsequent statement that he was and would be
an impartial juror, even though the trial judge, after pointed
questioning, came to the opposite conclusion. The applicable
standard of review precludes such an outcome. 
 To be sure, it is fair to assume from Juror A's question
that the possibility of conviction (and, derivatively, a
potentially unpleasant encounter with Rowe's lawyer) was on the
juror's mind prior to the conclusion of the case. Of course, many
jurors may contemplate the possibility of conviction, and the
unpleasantness it entails, as they listen to the evidence in a
criminal case. But without more, evidence that a juror is feeling
apprehension about the anticipated courtroom dynamics as the
verdicts are returned is not to be taken as evidence that the juror
has prejudged the case. Nor, obviously, does such evidence
constitute a proper basis for striking the juror.
 The district court's handling of the incident involving
Juror B is also beyond reproach. As we read the record, Rowe's
complaint concerning Juror B is governed by the rule that "a
defendant's failure to raise a claim of juror bias until after
trial, when the issue of potential bias was known by the defendant
during trial, amounts to a waiver of the claim." United States v.
Costa, 890 F.2d 480, 482 (1st Cir. 1989). Rowe knew at the time
Juror B came forward that the juror had been caring for his wife's
grandmother. Yet he declined to have the court ask Juror B whether
she knew of the relationship between her patient and himself. Rowe
must now live with the consequences of his decision.
 Rowe's challenge to this line of reasoning that he was
placed in an untenable situation because further inquiry into the
matter necessarily would have disclosed the nature of the
relationship between Juror B's patient and himself is anchored
upon a false assumption. Further inquiry would not necessarily
have disclosed the nature of the relationship; it quite obviously
could have proceeded by means of a non-leading question such as 
"Do you know of any connection between your patient and the
defendant?" In view of this, the anti-sandbagging rationale for
our waiver rule would appear to apply to this case with special
force. See Costa, 890 F.2d at 482 ("Any other rule would allow
defendants to sandbag the court by remaining silent and gambling on
a favorable verdict, knowing that if the verdict went against them,
they could always obtain a new trial by later raising the issue of
juror misconduct.").
B. The Challenge to Count III
 As we have stated, Rowe contends that the district court
erred in denying his Fed. R. Crim. P. 29 motion for a judgment of
acquittal on Count III. Rowe's claims of error mirror those
presented below: (1) because EDI was, in fact, paying the monthly
rent on the Castle Road residence, Rowe was not obligated to list
the payment as a current personal expenditure; and (2) because
Schedule J uses the disjunctive in asking a chapter 7 petitioner to
list "Rent or home mortgage payment," he was within his rights to
list either one or the other, but not both. Although he does not
say so explicitly, Rowe's arguments on this point appear to derive
from the rule that, in a false statement prosecution, an answer to
a question is not fraudulent if there is an objectively reasonable
interpretation of the question under which the answer is not even
false. Cf. United States v. Bradstreet, 135 F.3d 46, 51-52 (1stCir.) (endorsing, in a securities fraud case, the reasoning of
United States v. Migliaccio, 34 F.3d 1517, 1522-25 (10th Cir. 1994),
to this effect), petition for cert. filed, __ U.S.L.W. __ (U.S.
Apr. 16, 1998) (No. 97-1707).
 The latter of Rowe's two arguments is not easily decided. 
Working against Rowe are the facts that Schedule J quite clearly
seeks a snapshot view of a chapter 7 petitioner's current
expenditures, and that when a chapter 7 petitioner lists on
Schedule J only a rent payment (or a home mortgage payment) though
he or she actually has both a monthly rent payment and a monthly
home mortgage payment, the petitioner would appear to frustrate, in
quite an obvious way, the primary purpose of the schedule. In view
of this, and in the absence of any other line on Schedule J which
clearly applies to payments of this sort, but see infra at 20
(noting the potential applicability of the line asking for
"Installment payments" other than automobile payments), we think
the line asking for a petitioner's "Rent or home mortgage payment"
might reasonably be regarded as a shorthand version of the
following imperative: "List here your total monthly payment
ascribable to all rent or mortgage obligations." So also do we see
as potentially relevant the authority, in this circuit and
elsewhere, for construing the conjunction "or" to mean "and" in a
statute (even a penal statute) where the clear purpose of the
statute requires such a construction. See United States v.
Scivola, 766 F.2d 37, 45 (1st Cir. 1985) (reading 18 U.S.C. 
1623(d) to preclude a perjury prosecution against a person who has
recanted perjurious testimony only if the testimony "has not
substantially affected the proceeding" in which it was given, andif "it has not become manifest that [the] falsity [of the
testimony] has been or will be exposed"); see also, e.g., United
States v. Fornaro, 894 F.2d 508, 510-11 (2d Cir. 1990) (same);
United States v. Moore, 613 F.2d 1029, 1039-45 (D.C. Cir. 1979)
(same); but see United States v. Smith, 35 F.3d 344, 346-47 (8thCir. 1994) (disagreeing with Fornaro and similar cases and giving
effect to the plain language of the statute). 
 Yet there are considerations working in Rowe's favor as
well. When a question asks for "x or y" in such a way as to
suggest an assumption that only x or y pertains, to respond only
"x" or only "y" when, contrary to the question's assumption, bothx and y pertain would arguably not be false (though it might be
misleading). To illustrate by means of an imperfect analogy,
answering "President" to the question "Was Gerald Ford President or
Vice-President?" might be misleading; but it would arguably not be
criminal under a statute that penalizes only "false" statements (as
18 U.S.C. 152 does). Also potentially relevant and weighing in
on Rowe's side are the principles undergirding the rule of lenity,
see, e.g., Dunn v. United States, 442 U.S. 100, 112 (1979) (noting
that the rule "is rooted in fundamental principles of due process
which mandate that no individual be forced to speculate, at peril
of indictment, whether his conduct is prohibited"), and that the
government, to our surprise, has all but conceded that Rowe's
argument would have force but for the following three facts: (1)
the question asked for Rowe's "home mortgage" payment (emphasis
supplied); (2) the Highland Avenue residence was not Rowe's home;
and (3) in any event, "Rowe offered no other evidence, either in
the form of witnesses or documents[,] to support his testimony that
the mortgage amount was $395 per month. Government's Brief at 38.
 Although we ultimately do not rule on the merits of
Rowe's second argument because we agree with his first, see infraat 20-22, we believe it important to note our dissatisfaction with
the government's substantive response to the second argument. We
are quite perplexed at the government's insistence that Rowe'sfailure to introduce evidence corroborating his testimony as to his
monthly mortgage payment constitutes sufficient proof (in
conjunction with the evidence of the apparently minimal
inexactitude of the $395 figure, see supra note 1) for the jury to
have found beyond a reasonable doubt that Rowe's $395 answer
fraudulently misrepresented his actual monthly mortgage payment on
the Highland Avenue property. To the extent that the government
can be seen to have proceeded under an alternative theory that,
even if Rowe was not obliged to list the rental payment on the
Castle Road property, his response to Schedule J's request for his
"Rent of home mortgage payment" was fraudulent because $395 was not
his actual monthly mortgage payment, but see Indictment at 19-22
(failing even to hint at such an alternative theory), the
government bore the burden of proving the falsity of Rowe's answer
beyond a reasonable doubt, see Bradstreet, 135 F.3d at 52. And the
absence of evidence corroborating Rowe's oral testimony (even when
taken with the other "evidence" on this point, see supra note 1) is
quite plainly insufficient to ground such a finding.
 We also are troubled by the government's argument that
Schedule J requests only a "home mortgage payment" and that the
mortgage payment Rowe listed did not pertain to his "home" i.e.,
to the "place where [Rowe] live[d]." Government's Brief at 39. In
expressing some doubt about the persuasiveness of Rowe's second
argument, we already have observed that failing to list the sum
total of all rent and mortgage payments on Schedule J's "Rent or
home mortgage payment" line would seem to counteract the purposes
of the schedule. See supra at 16-17. We acknowledge that there is
room for debate on this point; one might plausibly argue that a
mortgage payment pertaining to a property which does not constitute
petitioner's residence is more appropriately listed in the space
provided on Schedule J for "Installment payments" other than
automobile payments. But the government has not argued that
mortgage payments pertaining to non-residential properties should
be recorded elsewhere on Schedule J. Instead, it has merely
asserted, without limitation, that a chapter 7 petitioner who,
acting within the spirit (if not the letter) of Schedule J,
includes such a mortgage payment on the "Rent or home mortgage
payment" line concomitantly provides "an answer to the question in
the bankruptcy form [that is] not true." Government's Brief at 39. 
In our view, this argument fails to see the forest for the trees.
 In any event, the fraud alleged in Count III, and the
government's overriding theory as to Count III, has not been Rowe's
listing of his mortgage payment; it has been Rowe's failure to list
the monthly rental payment for the Castle Road property EDI was
making on his behalf. And on this point, the government really has
no answer to Rowe's argument that, precisely because EDI was making
the payment (a fact which the government not only concedes, but in
fact charged in the indictment, see Indictment at 21), Rowe's
failure to list it as a current personal monthly expenditure was
not bankruptcy fraud. The government may well be correct in
asserting that Rowe filled out Schedule J as he did because he
wished to keep his relationship with EDI a secret. So too may it
be correct in contending that Rowe's listing of the Highland Avenue
mortgage payment was disingenuous, as evidenced by both Rowe's
failure to list the mortgagee of the Highland Avenue property as a
creditor elsewhere on his schedules and the strong likelihood that
EDI funds also were used to make the mortgage payments. But that
does not make the failure to list the rental payment a crime, as
the indictment charged. Schedule J is directed at ascertaining the
"CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)." And in our view,
an objectively reasonable interpretation of that which constitutes
a current expenditure of an individual debtor excludes expenditures
of non-debtor assets by a third party to benefit a debtor (even
expenditures for which repayment would eventually be sought, as
apparently was the case here). See Bradstreet, 135 F.3d at 51-52; 
cf. 5 Collier on Bankruptcy 547.03[2] (15th ed. 1997) ("When a
third person makes a loan to a debtor specifically to enable that
debtor to satisfy the claim of a designated creditor, the proceeds
never become part of the debtor's assets . . . . The rule is the
same regardless of whether the proceeds of the loan are transferred
directly by the lender to the creditor or are paid to the debtor
with the understanding that they will be paid to the creditor in
satisfaction of his claim . . . ."); Brown v. First Nat'l Bank, 748
F.2d 490, 491-92 (8th Cir. 1984) (similar). Thus, the district
court erred in denying Rowe's Fed. R. Crim. P. 29 motion for a
judgment of acquittal on Count III.
C. Sentencing Issues
 A review of the Memorandum of Sentencing Hearing and
Report of Statement of Reasons ("Statement of Reasons") reveals
that the district court relied heavily on the conduct underlying
Count III in determining the loss to creditors Rowe intended to
cause, and that Rowe obstructed justice and engaged in more than
minimal planning. It is therefore clear that we must vacate Rowe's
sentence and remand the cause for a second sentencing hearing. On
remand, we urge the court, if it should again deem an upward
adjustment appropriate for violation of a judicial order under
U.S.S.G. 2F1.1(b)(3)(B), to specify which order of the Bankruptcy
Judge and/or the Clerk of the Bankruptcy Court Rowe violated by
engaging in the conduct underlying Count II (the lone remaining
count of conviction). Cf. Statement of Reasons at 3. We also
urge the court, should it again impose an obstruction of justice
enhancement, to explain how any obstructive conduct relates to the
conduct underlying Count II. Cf. id. at 2.
D. The Incident Involving Juror C
 The incident involving Juror C raises the unusual issue
of the nature of a trial court's obligation (if any) to share with
trial counsel a post-verdict communication from a juror. Proper
resolution of this issue is not at all straightforward. On the one
hand, the analogy the district court drew to our cases prohibiting
counsel from communicating with jurors after a trial, see, e.g.,
Kepreos, 759 F.2d at 967, is far less than perfect because it was
a juror, and not counsel, who initiated the post-trial
communication at issue here. Moreover, by failing to make the
letter part of the record, the court effectively made itself the
final word as to whether the letter revealed anything that could
call the legality of the verdicts into question. Finally, the fact
that the court also received two rather unorthodox communications
from jurors prior to the verdicts raises questions about whether
the court properly exercised any discretion it might have had with
respect to this situation. In our view, there is much to be
gained (and little we can see to be lost) in providing Rowe with
concrete evidence that Juror C's concerns were, for example,
entirely unrelated to the issues raised by Jurors A and B.
 There are, on the other hand, also countervailing
considerations. Despite knowing about the letter prior to
sentencing, Rowe's counsel precluded any opportunity for reflective
consideration of the matter by waiting until after the sentence was
imposed even to raise it. Furthermore, at oral argument before us,
Rowe's counsel conceded that he "had some vague idea" about the
contents of the letter, which apparently was, at least in part, a
plea for leniency at sentencing. All this leads us to conclude
that there may well be less of a controversy on this issue than is
first apparent.
 In any event, we think it best at this point simply to
leave this matter for further argument and record development
following remand. Especially in view of the communications from
Jurors A and B, we are hard-pressed to see how keeping the letter
from Juror C out of the record would be within any discretion the
district court might have on this issue. But if, on further
reflection, the court sees compelling factual and/or legal reasons
which both outweigh the very strong interests Rowe has in reviewing
the letter and render inadequate the measures at the court's
disposal for ensuring jury and juror confidentiality, the court
should state those reasons with particularity to facilitate any
further review we may be called upon to conduct.
 IV.
 For the reasons stated, we affirm Rowe's conviction on
Count II, reverse Rowe's conviction on Count III, and vacate and
remand for resentencing.