**UNITED STATES of America**

v.

**Edward M. MEZVINSKY**

**No. CRIM.01–156.**

United States District Court,
E.D. Pennsylvania.

June 3, 2002.

Robert Zauzner, Assist. U.S. Atty., Philadelphia, PA, for U.S.

Stephen R. LaCheen, Philadelphia, PA, Bryant Welch, Potomac, MD, for Edward M. Mezvinsky.

## MEMORANDUM

DALZELL, District Judge.

Defendant Edward M. Mezvinsky is charged here with sixty-nine counts of violations of federal law arising from twenty-four allegedly fraudulent schemes, and related financial crimes, committed over a twelve-year period. When Mezvinsky gave notice of a mental health defense pursuant to Fed.R.Crim.P. 12.2, the Government responded with a motion to exclude that defense.

After extensive briefing as well as the conduct of over four days of hearing at which we heard a succession of experts testify as to the mental health issues, we are at last in a position to decide the Government's motion. As this issue is highly consequential for both sides, we consider it at some length.

### Background

On March 22, 2001, a Grand Jury returned a sixty-six count Indictment charging Mezvinsky with fraud and related offenses. On February 7, 2002, the Grand Jury returned a Superseding Indictment that added three additional counts regarding an alleged scheme that took place while Mezvinsky was on pretrial release.

The Government claims that Mezvinsky was engaged between 1989 and December of 2001 in twenty-four separate fraudulent schemes in which institutions and people lost over $10.4 million. Specifically, the Superseding Indictment charges Mezvinsky with one count of making a false statement to an agency of the United States in violation of 18 U.S.C. § 1001, as well as two counts of making false statements to financial institutions, in violation of 18 U.S.C. § 1014. The Superseding Indictment also charges fifty-nine counts of fraud, namely, fifteen counts of mail fraud, in violation of 18 U.S.C. § 1341, thirty-nine of wire fraud, in violation of 18 U.S.C. § 1343, and five of bank fraud, in violation of 18 U.S.C. § 1344. It also charges two counts of false statements on tax returns, in violation of 26 U.S.C. § 7206(1), and five counts of structuring currency transactions in violation of 31 U.S.C. § 5324(a)(3).

On July 2, 2001, Mezvinsky filed a notice under Fed.R.Crim.P. 12.2 of an intention to present an insanity defense or other defense based on mental illness. Shortly thereafter, upon learning of defense counsel's possible conflict of interest, we appointed new counsel, Thomas Bergstrom, Esquire, to represent Mezvinsky. On February 25, 2002, pursuant to the leave we granted him, Mr. Bergstrom amended the Rule 12.2 notice to state that Mezvinsky would not present an insanity defense to Rule 12.2(a), but rather a "mental health defense via Rule 12.2(b)."[1] This subsection of the Rule refers to a "mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt", and the Advisory Committee Note thereto explains that this subsec-

---

1. This subsection of the Rule provides:
   (b) EXPERT TESTIMONY OF DEFENDANT'S MENTAL CONDITION. If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

tion "is intended to deal with the issue of expert testimony bearing upon the issue of whether the defendant had the 'mental state required for the offense charged'." Specifically, in his February 25, 2002 submission on Mezvinsky's behalf, Mr. Bergstrom advised that:

The mental health defense will include the following:

(a) defendant has suffered from a Bipolar mental disorder, with an onset likely in his late teens or early twenties, which remained undiagnosed and untreated for several decades;

(b) defendant has frontal lobe organic brain damage which was revealed in a Positron Emission Tomography Scan (PET) conducted on November 9, 2001. A follow-up scan will be done in April, 2002;

(c) defendant has suffered from a Lariam-induced toxic encephalopathy as a result of his ingesting the drug over time during his travels to the African continent.

Shortly after Mezvinsky filed this Rule 12.2(b) notice, the Government filed its motion to exclude those defenses. In essence, the Government contends that Mezvinsky's defenses constitute yet another con. This con, the Government argues, includes Mezvinsky's misleading his own experts, *see* Gov't's Mot. at 20–22, note 7.

In accordance with *United States v. Pohlot*, 827 F.2d 889 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988), we commenced a hearing on March 15, 2002, and this hearing continued over the span of two months in what amounted to about four days of hearing time.[2] Before canvassing the hearing record, it is important first to describe, exactly, what our enterprise here entails. To do this, we begin with the pertinent statute and the jurisprudence of our Court of Appeals under it.

*Insanity Defense Contrasted with Mens Rea Defense*

In response to the verdict in the District of Columbia when John Hinckley was tried

---

**2.** The hearing was protracted by Mezvinsky's ever-changing defense counsel situation. By the time we convened the second day of hearing on April 9, 2002, defendant had, through the resources of his supporters, retained Bryant Welch, Esquire, as special counsel to deal with the mental health defense. On Mr. Bergstrom's motion, we admitted Mr. Welch *pro hac vice* even though Mr. Welch had no criminal defense experience; on the other hand, he had a great deal of experience in mental health areas, and indeed has a Ph.D. in clinical psychology that he received in 1976.

Shortly before the April 9 hearing convened, we were surprised to receive a motion to withdraw from Mr. Bergstrom. At the Government's suggestion, *see* N.T. at 324–25 (Apr. 9, 2002), in the middle of the reconvened hearing on April 9 we had an *in camera* conference with only Messrs. Bergstrom and Mezvinsky present, at which we determined that irreconcilable differences had arisen between attorney and client, and that therefore we would have to appoint a new criminal defense lawyer under the Criminal Justice

Act. As Mr. Welch was by now conducting the *Pohlot* hearing, and defendant's witnesses were testifying, we allowed Mr. Bergstrom to remain as standby consultative counsel until such time as we could find successor counsel. We therefore completed the testimony of witnesses who had appeared on April 9, with the exception of Dr. Claudia Baldassano.

We thereupon ordered Dr. Baldassano to produce copies of certain articles to which she referred in her April 9 testimony. We briefly reconvened on April 16 to receive those articles from her, and Mr. Welch was present for this brief proceeding.

By the time we reconvened on May 13, 2002, we had secured the services of Stephen Robert LaCheen, Esquire, to represent Mezvinsky as his chief trial counsel. By that time, however, with our leave, Mr. Welch had filed a comprehensive response to the Government's motion, and resumed as Mezvinsky's retained special counsel at the hearings on May 13 and 14, 2002. Mr. LaCheen was also present both days.

for his attempted assassination of President Reagan, Congress, after extended consideration, adopted the Insanity Defense Reform Act of 1984, Pub.L. No. 98–473, Title II, § 402(a), 98 Stat.2057, § 20, which is now codified at 18 U.S.C. § 17. The statute provides, in its entirety:

**Insanity Defense**

**(a) Affirmative Defense.**—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

**(b) Burden of proof.**—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

After Congress adopted the Insanity Defense Reform Act, the question immediately became whether there was something between the permissible affirmative defense of insanity and the impermissible defense of "[m]ental disease or defect." In this Circuit, the answer is an emphatic "yes".

In *Pohlot*, our Court of Appeals, in an opinion by Judge Becker, held that although "Congress intended § 17(a) to prohibit the defenses of diminished responsibility and diminished capacity, Congress distinguished those defenses from the use of evidence of mental abnormality to negate specific intent or any other mens rea, which are elements of the offense." *Pohlot*, 827 F.2d at 890. The Panel went on to write:

> While the contours of the doctrines of diminished responsibility and diminished capacity are unclear, the defenses that Congress intended to preclude usually permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection; however, these matters do not strictly negate mens·rea.

*Id.*

Having found this daylight in the statute, it is important to stress that the Court in *Pohlot* was at pains to note how narrow a ray of light this actually was:

> Only in the rare case, however, will even a legally insane defendant actually lack the requisite mens rea purely because of mental defect. As the House Report stated: "Mental illness rarely, if ever, renders a person incapable of understanding what he or she is doing. Mental illness does not, for example, alter the perception of shooting a person to that of shooting a tree." *House Report* at 15 n. 23. Similarly, a man who commits murder because he feels compelled by demons still possesses the mens rea required for murder. The government's burden of proving mens rea is therefore considerably less onerous than its previous burden of proving sanity.

*Id.* at 900.

Again, in demonstrating how narrow and "rare" this defense will be, the Court of Appeals, after citing a number of distinguished academic commentators, said:

> Commentators have agreed, however, that only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea as it is normally understood in American law. Even the most psychiatrically ill have the capacity to form intentions, and the existence of intent usually satisfies any mens rea requirement.

*Id.* at 903 (citation omitted).

Thus, stressing that "Courts should also be careful in deciding whether to issue jury instructions or to permit defense ar-

guments directing the jury to consider whether any evidence of mental abnormality negates mens rea", *id.* at 905, *Pohlot* entrusted the resolution of these difficult issues to the trial court:

> In light of the strong danger of misuse, we join other circuits that have directed district courts to examine proffered psychiatric testimony carefully "to determine whether the proof offered is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in deciding the ultimate issues."

*Id.* (quoting *United States v. Bennett,* 539 F.2d 45, 53 (10th Cir.), *cert denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976)). *Pohlot* emphasized that, in fulfilling this duty, "Courts should evaluate the testimony outside the presence of the jury." *Id.* at 906.

In a case with many striking similarities to this one, Judge Ludwig in *United States v. Bennett,* 29 F.Supp.2d 236 (E.D.Pa. 1997), *aff'd* 161 F.3d 171, 183 (3d Cir.1998), *cert. denied,* 528 U.S. 819, 120 S.Ct. 61, 145 L.Ed.2d 53 (1999), discussed the mens rea defense at the sentencing of John Bennett, the founder and mastermind of the infamous New Era Ponzi scheme.[3] Bennett's fraud spanned several years and was, he contended, the result of his sincere and deeply-held religious conviction that he was doing God's work. In rejecting this defense at the protracted sentencing hearing that followed Bennett's plea of *nolo contendere,* Judge Ludwig very helpfully explained how *Pohlot* applies to fraud cases like Bennett's and Mezvinsky's:

> As to each of the crimes charged in the present case, while the mens rea re-

quirements vary, all of them involve some type of intentionally false representation. As a matter of law, no amount of honest belief that an enterprise will succeed—or is worthwhile—can justify false, baseless, or reckless assertions or promises. *United States v. Boyer,* 694 F.2d 58, 59–60 (3d Cir. 1982). *See United States v. Hannigan,* 27 F.3d 890, 892 n. 1 (3d Cir.1994); *United States v. Cen–Card Agency,* 724 F.Supp. 313, 316–17 (D.N.J.1989). In order to have probative value as to mens rea, defendant's expert testimony must relate to the particular misrepresentations attributed to him in the indictment. If his clinical condition and symptomology can be logically connected to his subjective belief that his assertions were not false, baseless, or reckless vis-a-vis the truth, such evidence is admissible to show lack of mens rea. Otherwise, it is not—despite a strongly held religious conviction, whether or not arising from mental disorder, that his conduct was morally upright and would be societally beneficial.

*Bennett,* 29 F.Supp.2d at 240 (footnote omitted). Judge Ludwig therefore held that Bennett's motivating religious beliefs, even if in part delusional, could not support a *Pohlot*-satisfying defense because he did not negate the requisite mens rea of knowingly making false statements to the highly-sophisticated people whom he victimized in his Ponzi scheme.

The Court of Appeals affirmed Judge Ludwig on this, as well as on all other points. *See id.,* 161 F.3d at 183. In his opinion for himself, Judge Nygaard and the late Judge Seitz, Judge Scirica, after

---

**3.** Coincidentally enough, we had on our docket *In re Foundation for New Era Philanthropy Litigation,* MDL 1127, which constituted the consolidated civil actions arising out of Bennett's massive fraud through New Era. *See,*

*id.,* 175 F.R.D. 202 (1997). We are therefore intimately familiar with the details of the fraud that was the focus of Judge Ludwig's attention.

noting the trial judge's "broad discretion to admit or exclude expert testimony" under Fed.R.Evid. 702, held that Judge Ludwig properly excluded Bennett's "expert testimony expressly stating that he lacked the mental capacity to commit the charged crimes." *Id.* at 185. Observing that "[a]ll of the excluded questions asked the expert to state, in conclusory terms, how Bennett's mental disorders affected his criminal culpability", Judge Scirica held for the panel that "[t]hat decision is exclusively within the province of the jury" and not permissible expert testimony under Fed. R.Evid. 704(b).

Our duty here is thus a highly focused one under the regime of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) that makes us the gatekeeper to assure that juries only hear reliable and, most pertinent to this case, relevant expert testimony. In order to determine that "fit" between proffered testimony and what is properly at issue, *see, e.g., Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir.2001), our focus must be on whether Mezvinsky's expert testimony fits into the narrow mens rea gap that Congress and *Pohlot* recognize in the Insanity Defense Reform Act.

Our immersion in the testimony of the many experts we heard also convinces us of the wisdom of Judge Boudin's approach to this problem in *United States v. Schneider,* 111 F.3d 197 (1st Cir.1997). *Schneider* involved a mail and wire fraud prosecution of "a classic 'bust-out' scheme" [4] that was carried out over the course of four or five months. *Id.* at 199. The panel in *Schneider* affirmed the exclu-

sion of proposed expert testimony that the defendant "was depressed, that he had impaired judgment (due to his depressed state and overmedication), and that he was subject to blackouts", as well as testimony that his medication "would impair intellectual function in a variety of ways" and "permit misperception and delusion." *Id.* at 202.

The First Circuit affirmed the exclusion by taking a different route from *Pohlot.* Although that Circuit took exception with *Pohlot*'s stress on whether the conduct at issue was "purposeful", *id.* at 203, *Schneider* held that the issue should be disposed of by reference to Fed.R.Evid. 403:

> The evidence, as we have said, is of limited relevance: showing 'impaired' judgment might help piece out a lack of deceit claim but falls well short of sufficient proof. At the same time, the expert testimony offered here could easily mislead the jury into thinking that such a medical condition amounts to temporary insanity or ameliorates the offense....

> Thus, we conclude that the district court was free to exclude this evidence on the ground that its capacity to mislead the jury substantially outweighed its limited relevance.

*Id.* at 203. We therefore will also balance the relevance, if any, of the proposed expert testimony against the concern that it "could easily mislead the jury" into exactly the kind of diminished responsibility or temporary insanity defenses that are forbidden under the Insanity Defense Reform Act.[5]

---

**4.** Such a scheme involves ordering merchandise on false credit references "without any intention of paying for the goods, which were then sold for whatever they would bring." *United States v. DeVincent,* 632 F.2d 147, 149

(1st Cir.), *cert. denied* 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980).

**5.** As Judge Boudin also put it about this Act and *Pohlot*'s teaching:

Our enterprise here therefore devolves to determine if Mezvinsky has presented the "rare case" that Congress and *Pohlot* contemplated could go to the jury. As will be seen, we hold that he falls far short in that regard.

*Analysis*

### 1. The Pertinent Mens Rea

Before considering the expert testimony we heard, it is important at the outset first to define, precisely, the relevant mens rea here. Before *that*, however, it is important to know what is *not* pertinent to our inquiry.

In this regard, we emphasize that the authority in this Circuit is clear that Mezvinsky's judgment and honest belief are of no moment under any of the applicable statutes. As the Court of Appeals has put it in an unbroken line of cases beginning with *United States v. Boyer*, 694 F.2d 58, 60 (3d Cir.1982), "[n]o amount of honest belief that the enterprise should ultimately make money can justify baseless, false or reckless misrepresentations or promises." As Judge Ludwig, with the Court of Appeals's approval, noted in *Bennett, supra,* even "a strongly held religious conviction, whether or not arising from mental disorder, that [a defendant's] conduct was morally upright and would be societally beneficial" is inadmissible, *Bennett,* 29 F.Supp.2d at 240. Thus, the issue is not, as Mezvinsky contends, whether he believes, as many do, that "Elvis still lives",[6] but whether Mezvinsky can stand at the gates of the estate and report that he is looking at Graceland.

Generically speaking, the various counts of the Superseding Indictment all require some degree of *scienter,* and that mental state requires an intention—and therefore a concomitant mental capacity—to deceive someone.

Specifically, the Superseding Indictment charges Mezvinsky with one count of making a false statement to an agency of the United States in violation of 18 U.S.C. § 1001. This statute by its terms requires that the statement be made "knowingly and willfully", *see id.* at subsection (a). Our Court of Appeals has described "the requisite intent under section 1001" as "deliberate action with knowledge that the statements were not true." *United States v. Gumbs,* 283 F.3d 128, 134 (3d Cir.2002).

The Superseding Indictment also charges Mezvinsky with two counts of making false statements on tax returns, in violation of 26 U.S.C. § 7206(1). This statute makes it a crime when anyone,

> Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter...

Regarding the requisite mental state, our Court of Appeals has required that:

> To prove willfulness in a criminal tax case, the government must show that the law imposed a duty on the defen-

---

*Pohlot*'s other theme is the capacity of evidence of this kind to mislead. Congress raised the hurdle for an insanity defense and barred a new diminished capacity defense that courts were beginning to invent. Yet the evidence offered, both here and in *Pohlot,* suggests that the defendant was temporarily out of his mind (even though not insane under section 17(a)) and that his crime was mitigated by his psychological condition. Such evidence tends to reintroduce the very concepts that Congress wanted to exclude and thereby to mislead the jury. *Id.*

6. Def't's Opp. to Gov't's Mtn. at 8.

dant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.

*United States v. Moses,* 148 F.3d 277, 283 (3d Cir.1998) (internal citations omitted).

The Superseding Indictment asserts five counts of structuring currency transactions in violation of 31 U.S.C. § 5324(a)(3). This statute criminalizes the structuring of any transaction "for the purpose of evading the reporting requirements" for currency transactions involving more than $10,000. As might be expected given this statutory language, our Court of Appeals has held that it is "not enough" for the Government merely to prove that "the accused structured transactions in amounts under $10,000", but must also show

> ... that he structured for the specific purpose of evading the federal reporting requirements. If a person were ignorant of the requirements and deposited a large amount of cash in $9,000 installments, he would not violate section 5324.

*United States v. Dollar Bank Money Market Account No. 1591768456,* 980 F.2d 233, 237 (3d Cir.1992).

As mentioned at the beginning of this Memorandum, the Superseding Indictment charges Mezvinsky with fifty-nine counts of fraud, specifically, mail, wire and bank fraud in violation of 18 U.S.C. §§ 1341, 1343 and 1344, respectively. Both § 1341 and § 1343 begin with identical statutory language, to wit, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses", is guilty of a crime if he uses the mail or wire "for the purpose of executing such scheme or artifice." Bank

fraud under § 1344 begins with cognate language, that is, "Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution". Given the identical statutory language for mail and wire fraud, it is unsurprising that Judge Sand in his *Modern Federal Jury Instructions* proffers the same definition for "intent to defraud", namely, "to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another." *See* Leonard B. Sand, et al., 2 *Modern Federal Jury Instructions,* Inst. 44–5 (1998). Under bank fraud, Judge Sand states that "[t]o act with intent to defraud means to act willfully and with the specific intent to deceive, for the purpose of causing some financial loss to another." *Id.* at Inst. 44–11.

Although there are, in their approved formulations, variations in the *scienter* requirements under these different criminal statutes, it is fair to identify a common thread, and that is an intention to deceive a person or institution.[7] Mezvinsky's mens rea defense, therefore, must be probative as to whether he had the mental capacity to form such an intention over the twelve-year course of his alleged two dozen schemes to defraud. As a shorthand, therefore, we will summarize the common aspect of this mental ability with the locution "capacity to deceive" as we scrutinize the proffered expert testimony through the lenses of *Pohlot* and Rule 403.

## 2. *The Proffered Testimony*

Over the course of what amounted to about four days of hearings, Mezvinsky offered five experts[8] in support of his

---

7. As the Government notes, we recognize that "[t]he present version of the [structuring] statute eliminated the requirement imposed in *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), that the

government also prove a specific intent to violate the law." Gov't's Rep. Br. at 3, n. 2.

8. Mezvinsky also proffered a report of Dr. Ashley Croft, a British critic of the anti-malar-

mental health defenses. The Government called three to testify.

Specifically, Mezvinsky called Dr. Gary Steven Sachs, a psychiatrist who is expert in bipolar mental health problems; Dr. Claudia Baldassano, another psychiatrist with expertise treating patients suffering bipolar disorders; Dr. Jonathan Brodie, a Professor of Psychiatry who is expert in the field and in Positron Emission Tomography ("PET"); Dr. Wilfred G. Van Gorp, an expert in neuropsychology; and Dr. Mark J. Mills, a forensic psychiatrist who is a professional expert witness. The Government called Dr. Hans O. Lobel, a former Center for Disease Control physician, who is expert in malaria epidemiology and prevention; Dr. Ruben Gur, Professor of Neuropsychology at the University of Pennsylvania, who is expert at brain imaging (including PET) and neuropsychological diagnosis; and Dr. Robert L. Sadoff, an expert forensic psychiatrist.

We consider the testimony of these experts as each bears on the three mental health defenses mentioned in Mezvinsky's February 25, 2002 notice under Rule 12.2(b), i.e., that he (a) "suffered from a Bipolar mental disorder", (b) "has frontal lobe organic brain damage", and (c) "has suffered from a Lariam-induced toxic encephalopathy". As to each defense, the questions we must consider are whether Mezvinsky is offering permissible mens rea evidence under *Pohlot* and Fed. R.Evid. 403.

### (a) *Mezvinsky's Bipolar Disorder*

It is undisputed [9] that Mezvinsky suffers *some* degree of bipolar disorder. All of the experts also agree that Mezvinsky is not schizophrenic, delusional or subject to auditory or visual hallucinations. Beyond these few points of agreement, the experts diverge on how severe that disorder is or even when it began. For our purposes, however, we (mercifully) need not decide those interesting and difficult clinical questions. Our task is rather only to consider whether such evidence is fairly probative of a mens rea defense and thus whether it may pass through the narrow *Pohlot*–403 doors.

Because it is central to Mezvinsky's mental health defense, we begin with defining what, exactly, a bipolar disorder is. For this definition, all of the psychiatric experts looked to the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.) published by the American Psychiatric Association and referred to throughout the testimony as DSM–IV.

At the threshold, we meet what the DSM–IV refers to as a "Manic Episode", which it describes "as euphoric, unusually good, cheerful, or high." *Id.* at 357. While this description may sound benign and "initially have an infectious quality for the uninvolved observer," *id.*, the DSM–IV states that "it is recognized as excessive by those who know the person well." *Id.* As Mezvinsky claims that the schemes at issue here were the fruit of Manic Episodes,

ial drug Lariam. Notwithstanding the Court's arranging for his live, interactive televised appearance on May 14, 2002, Dr. Croft elected not to appear. As we very much benefitted from cross-examination and our ability to colloquy all the rest of the experts, Dr. Croft's absence undermines his value as an expert witness. It was clear from a number of witnesses, however, that Dr. Croft is a scientific lone voice regarding Lariam's effects on mental health.

9. At least for purposes of this motion. The Government was at pains during the hearing and in its briefing to make clear that its concession on this point was only for purposes of appraising Mezvinsky's proffered defenses.

we confine our bipolar discussion to that antipode alone.[10]

Our attention was repeatedly called to DSM–IV's "Criteria for Manic Episode", *id.* at 362. Because those criteria figure so prominently in the testimony, we reproduce them in full:

**Criteria for Manic Episode**

A.  A distinct period of abnormally and persistently elevated, expansive, or irritable mood, lasting at least 1 week (or any duration if hospitalization is necessary).

B.  During the period of mood disturbance, three (or more) of the following symptoms have persisted (four if the mood is only irritable) and have been present to a significant degree:

    (1) inflated self-esteem or grandiosity

    (2) decreased need for sleep (e.g. feels rested after only 3 hours of sleep)

    (3) more talkative than usual or pressure to keep talking

    (4) flight of ideas or subjective experience that thoughts are racing

    (5) distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

    (6) increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

    (7) excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g. engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments)

C.  The symptoms do not meet criteria for a Mixed Episode (see [DSM–IV] p. 365).

D.  The mood disturbance is sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features.

E.  The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, or other treatment) or a general medical condition (e.g. hyperthyroidism).

**Note:** Manic-like episodes that are clearly caused by somatic antidepressant treatment (e.g., medication, electroconvulsive therapy, light therapy) should not count toward a diagnosis of Bipolar I Disorder.

*Id.*

Bipolar patients may also experience what are referred to in the literature as "Hypomanic Episodes", which the DSM–IV defines as "not severe enough to cause marked impairment in social or occupational functioning or to require hospitalization", *id.* at 365, and therefore are less dramatic than the more protracted Manic Episodes. DSM–IV defines a Hypomanic Episode as:

> ... [A] distinct period during which there is an abnormally and persistently elevated, expansive, or irritable mood that lasts at least 4 days (Criterion A). This period of abnormal mood must be accompanied by at least three additional symptoms from a list that includes inflated self-esteem or grandiosity (nondelusional), decreased need for sleep, pressure of speech, flight of ideas, distractibility, increased involvement in goal-directed activities or psychomotor agitation, and excessive involvement in

---

**10.**  To be sure, Mezvinsky's experts made occasional reference to his depression, but the burden of testimony was that his Manic Episodes accounted for his "bad judgment" and "poor choices".

pleasurable activities that have a high potential for painful consequences (Criterion B). If the mood is irritable rather than elevated or expansive, at least four of the above symptoms must be present. This list of additional symptoms is identical to those that define a Manic Episode (see [DSM–IV] p. 357) except that delusions or hallucinations cannot be present....

*Id.*

All of the psychiatric experts agreed that Mezvinsky had, at least sometimes, Hypomanic Episodes but, as might be expected, his experts stressed the Manic Episodes even though no one cited a single delusion or hallucination.

Much testimonial attention was given to the first criterion for Manic Episode, "inflated self-esteem or grandiosity". Although Mezvinsky's experts emphasized that this criterion had to be part of the constellation of other criteria, it was a crucial dimension in the diagnosis; as Dr. Baldassano put it, it is "necessary but not sufficient." Mezvinsky's experts agree that all highly-successful people demonstrate "inflated self-esteem or grandiosity" and that it is a fair expectation that one would find this condition among all 535 members of Congress, bearing in mind that Mezvinsky himself once served in the House of Representatives. Indeed, Dr. Baldassano staked out, among her many extravagant positions, the notion that most Chief Executive Officers of corporations not only have this first criterion, but are in fact bipolar.

Absorbing as these questions genuinely are, however, the pertinent inquiry here is how, if at all, Mezvinsky's bipolar condition affected his capacity to deceive (as we have defined it above) during the relevant times.

Mezvinsky's most eminent expert on this point is Dr. Gary Sachs, who is the Director of the Bipolar Research Program and a bipolar clinic at Massachusetts General Hospital in Boston. Dr. Sachs, on cross-examination, acknowledged that people suffering from bipolar disorder *can* engage in intentional conduct and have the capacity to deceive. Noting that Mezvinsky was never psychotic or delusional or presented any evidence of hallucinations, Dr. Sachs admitted that Mezvinsky has the capacity to deceive; as he put it in colloquy with the prosecutor,

Q You say in your report that a person with bipolar disorder has the capacity to deceive. Is that correct?

A Sure.

Q And would you agree that Mr. Mezvinsky, based on your diagnosis of him as having bipolar disorder, similarly had the capacity to deceive.

A Right. I think having the capacity is something that most have.

N.T. at 220–21 (Apr. 9, 2002). Mezvinsky was also by no means incapable of lying. As Dr. Sachs forthrightly put it in colloquy with us,

THE COURT: Is it your testimony that Mr. Mezvinsky is incapable of lying?

THE WITNESS: Absolutely not.

N.T. at 294 (Apr. 9, 2002). When the Government presented inconvenient instances that suggested the factual falsity of Mezvinsky's reports of Manic Episodes[11], Dr. Sachs was reduced to say

11. For example, Dr. Sachs was unaware that Marjorie Margolies–Mezvinsky, the defendant's wife who presumably "know[s] the person well" within the meaning of DSM–IV's definition of "Manic Episode", never reported any untoward euphoria pre-indictment. In colloquy with us, Dr. Sachs "[a]bsolutely" agreed that psychiatrists (and judges) share an "occupational hazard" of "con artists who know what others want to hear." N.T. at 253

that, "This is a complicated case ... bipolar was not 'the only cause'", but it was merely "a cause" of Mezvinsky's poor judgment. Most to the point, on recross-examination, when the Government asked exactly what Mezvinsky's capacities were at various times over the twelve years in question, Dr. Sachs conceded that, "I don't know what he knows at any given time."

Indeed, no expert on Mezvinsky's behalf was in a position to say that at any given time during the twelve-year history of the alleged schemes to defraud that Mezvinsky did not have a capacity to deceive. In this regard, it seemed to us that Dr. Sadoff, looking at the record in this case, came to the only conclusion that makes any sense at all. Dr. Sadoff was impressed that Mezvinsky was able to keep track of widely disparate schemes at the same time, and that a "true manic" probably couldn't do that. This is because, as Dr. Sadoff pointed out, the bipolar condition is *not* a cognitive disorder. People like Mezvinsky are not out of touch with reality.

To be sure, Dr. Sadoff testified that there were unusual cases where extreme bipolar disorders took the patients beyond cognition of reality, but those episodes were always brief. He was aware of no case where the episode lasted beyond a few days. In this regard, it is important to note that all of the psychiatric experts agreed that Manic Episodes are just that—episodes.[12] No expert could think of a single case where a bipolar patient was so divorced from reality that the condition persisted without interruption over a period of years, as is the claim here.[13] While Dr. Baldassano from time to time staked out the preposterous position that half of the bipolar patients cannot appreciate the difference between right and wrong, she conceded that Mezvinsky *was* aware of what he was doing, and had the capacity to enter into intentional conduct. She in fact conceded, in her testimony of May 13, 2002, that she "had a hard time pinpointing any manic episodes" that Mezvinsky had, a difficulty Dr. Sachs shared. Conceding that Mezvinsky was never psychotic, delusional or hallucinatory, Dr. Baldassano admitted that she really "can't say" whether Mezvinsky knew what he said was false at any give time.[14]

On this record, Mezvinsky's proffered testimony as to his bipolar disease simply cannot get through the *Pohlot* door. To be sure, his experts are prepared to testify

(Apr. 9, 2002). Without formally judging the question, we fear that David Mamet's *House of Games* applies all too well here to Dr. Sachs, who is an unquestionably distinguished and honorable physician.

12. Indeed, as Dr. Sachs put it, "By its nature, bipolar illness is episodic." N.T. at 180 (Apr. 9, 2002).

13. Nor has any court in any reported decision upheld a mens rea defense when the criminal activity spanned more than a week. We ordered the parties to bring any such case to our attention, and Mezvinsky admitted that none exists. *See* Def't's Opp. to Gov't's Mtn. at 20, note 4. In its reply brief, the Government cites several cases where mens rea de-

fenses were disallowed when the conduct in question was done over extended time periods. *See* Gov't's Rep. Br. at 28–30.

14. In response to questioning from the prosecutor, Dr. Baldassano also admitted that there is no scientific literature on bipolar patients' ability to lie:

Q. If we wanted to look for an article or a study that did that, that specifically focused and came up with a model to study of a bipolar patient's ability to know what is false. We haven't been able to locate an article like that. And do you know of any study?
A. I don't. I don't. And I can't imagine that any would appear in the literature.
N.T. at 482 (Apr. 16, 2002).

at length that Mezvinsky's condition resulted in "poor judgment"[15] and "bad choices", but none is in a position to state that, at any relevant time, Mezvinsky did not have the capacity to deceive. While it is true that at times in her testimony Dr. Baldassano seemed to get near that door, she did so in the course of testifying that half of bipolar patients are "constantly" unable to tell right from wrong.[16] Since she and other experts agreed that 1.2% of the United States population have a bipolar condition,[17] based upon the latest census data, this would mean that 3,377,064 Americans would be candidates for a Rule 12.2 defense (281,422,000 people[18] × .012)[19], and half of them, or 1,688,532,

would in fact be able to sustain that defense—so much for *Pohlot*'s "rare case"!

The blurring of the general and the specific, of admissible medical opinion and conjecture, turned the hearing into a mist of compound ifs and unsupported speculation.[20] This bog of Mezvinsky's proffered testimony confirms the wisdom of Judge Boudin's approach in *Schneider, supra*, in that this vaporous evidence "suggests that the defendant was temporarily out of his mind (even though not insane under Section 17(a)) and that his crime was mitigated by his psychological condition", evidence that "reintroduce[s] the very concepts that Congress wanted to exclude and thereby to mislead the jury."

**15.** For example, the DSM–IV makes reference to this in its narrative discussion of Manic Episodes:

> Expansiveness, unwarranted optimism, grandiosity, and poor judgment often lead to an imprudent involvement in pleasurable activities such as buying sprees, reckless driving, foolish business investments, and sexual behavior unusual for the person, even though these activities are likely to have painful consequences.

DSM–IV at 358.

**16.** *See* N.T. at 417–18 (Apr. 9, 2002). A week later, Dr. Baldassano seemed to amend her testimony to suggest that "I think what I said was that up to 50 percent of bipolar patients lack insight in the setting of an acute manic episode." N.T. at 469 (Apr. 16, 2002).

**17.** The DSM–IV states the "prevalence" of Bipolar I in terms of a range: "The lifetime prevalence of Bipolar I Disorder in community samples has varied from 0.4% to 1.6%." *Id.* at 385. As to Bipolar II Disorder, the DSM–IV states that: "Community studies suggest a lifetime prevalence of Bipolar II Disorder of approximately 0.5%." *Id.* at 395. Thus, the DSM–IV range for bipolar disorders would be 0.9% to 2.1% of the population.

**18.** Statistical Abstract of the United States: 2001, Table 24, p. 26 (U.S. Census Bureau 2001), *available at* http://www.census.gov/prod/2002pubs/01statab/stat-ab01.html.

**19.** Using the DSM–IV range of 0.9% to 2.1%, the range of Americans as candidates for a Rule 12.2 defense would be 2,532,798 to 5,909,862.

**20.** To take only one example, our extended colloquy with Dr. Sachs about what constitutes a "foolish business investment" (within the DSM–IV's meaning) in a capitalistic, entrepreneurial society reveals how utterly elusive these problems are, and thus how hopelessly vexing and unhelpful they would be to any jury. *See* N.T. at 193–97 (Apr. 9, 2002). In that colloquy, the case of Fred Smith, whose Yale economics professor pooh-poohed the "foolish" idea we now call Federal Express, figured prominently. *See* Vance H. Trimble, *Overnight Success: Federal Express and Frederick Smith, Its Renegade Creator* 80 (1993) ("Professor Challis A. Hall, Jr., read the twelve or fifteen pages Fred Smith had typed up as his 1965 term paper in the course designated Economics 43A. For a few minutes he thought about the hub-and-spokes concept expounded .... Then he picked up his red pen and wrote 'C.' ").

We have in another context considered the difficulty of importing DSM–IV's inclusive categories into the resolution of specific problems of criminal responsibility. *See United States v. Motto*, 70 F.Supp.2d 570, 573–76 (E.D.Pa.1999), *aff'd* 225 F.3d 651 (3d Cir. 2000) (discussing DSM–IV's "personality disorder" and "antisocial personality disorder").

*Schneider,* 111 F.3d at 203. To the extent Mezvinsky's proffered testimony as to his bipolar condition might slip through a crack in the *Pohlot* door, it simply cannot do so through the Rule 403 door given the very high likelihood of its misleading the jury into forbidden territory.

In its totality, as this evidence rarely, if ever, had any point of tangency with relevant questions, its hopelessly elusive nature simply would not be helpful to the trier of fact, as *Daubert* requires. *Daubert, supra,* 509 U.S. at 591–92, 113 S.Ct. 2786. Indeed, its indeterminacy is so great that Dr. Sachs, in response to Mr. Welch's question, could only throw up his hands, Sartre-like, at the futility of the *Pohlot* enterprise:

> Q O.K. And so in terms of, as in the case of the Pohlot decision, of looking at what someone's conscious intent is, we simply can't get a measure of what conscious intent is.
>
> A I don't have any reliable measure for that.
>
> Q O.K. You nor anyone else. Is that right?
>
> A That's right.

N.T. at 303–04 (Apr. 9, 2002). What, one may ask, could a jury do with testimony like this?

### (b) *The PET Scans*

Mezvinsky's second mental health defense claims that he "has frontal lobe organic brain damage which was revealed in a Positron Emission Tomography Scan (PET) conducted on November 9, 2001." This defense references a PET scan conducted on that date by Dr. Monte S. Buchsbaum, Professor of Psychiatry at the Mt. Sinai School of Medicine in New York City.

PET scans are a relatively new diagnostic tool that neuroscientists use to measure the glucose metabolic rates of different parts of the brain. To oversimplify somewhat, this is done by injecting the patient with F-deoxyglucose ("FDG") [21], which is mixed with trace amounts of radioactivity, and then taking axial slice images at six millimeter intervals and reconstructing those images with the aid of a computer. A computer also takes the numerical data and converts them into pixels to make colors. The different uptake rates of the FDG then can be compared against those rates in patients without abnormalities.[22]

According to Dr. Buchsbaum's PET scan of November 9, 2001, it showed that in Mezvinsky there was "diminished capacity at the frontal pole, and a patchy biparietal distribution." *See* Gov't Ex. 1, p. 1. Dr. Buchsbaum also opined that the scan showed that "[s]ome areas of the parietal/temporal border are also low" and that "[a]reas of the temporal lobe are also patchy and low in relative metabolic rate." *Id.* Dr. Buchsbaum conveyed his "impression" that this constituted an "[a]bnormal scan with frontal lobe decrease consistent with Alzheimer's disease, toxic encephalopathy or Pick's disease." *Id.* at 2.

Although Dr. Buchsbaum himself did not testify, two acknowledged experts on PET opined about the significance of the November 9, 2001 scan, Dr. Ruben Gur, the Government's witness, and Dr. Jonathan Brodie, Mezvinsky's. While these two eminent witnesses disagreed as to the conclusions to be drawn from Dr. Buchsbaum's PET scan—for example, Dr. Gur

---

**21.** Examiners actually use fluoride 18, which, as Dr. Ruben Gur noted, "has an excess of positrons, which are positively-charged particles." N.T. at 101 (Mar. 15, 2002).

**22.** For a more detailed and complete description, *see* Dr. Gur's testimony at *id.* 99–105.

saw a "hypofrontal decrease" that could be the result of depression or nascent Parkinson's disease, while Dr. Brodie saw a toxic encephalopathy as more likely—there were wide areas of agreement in what they had to say.

For example, both agreed that no study exists that links the diminished capacities in various parts of Mezvinsky's brain to any specific disorder. Both agreed that a PET scan is only a "snapshot" of a patient's brain at one particular time, and that one cannot make retrospective appraisals of that brain from such snapshots. Thus, neither expert could make any inference about the state of Mezvinsky's brain at any point during the twelve years in question here.

Most to the point of our inquiry under *Pohlot,* neither expert could identify anything in the November, 2001 PET scan, or in the one done in May of 2002, that would in any way bear on Mezvinsky's capacity to deceive. Interestingly in this regard, Dr. Gur co-authored in January of 2002 the very first paper that examined brain activity during simulated deception,[23] and Dr. Gur opined that this early research offers no support that any diminished aspect of Mezvinsky's brain had anything to do with his capacity to deceive.[24] As there is, therefore, no evidence that Mezvinsky's PET-identified brain abnormalities had any pertinence to his capacity to deceive, it is inadmissible under *Pohlot.* As it does not cross the *Pohlot* threshold of relevance and reliability, we do not even get to the Rule 403 question as there is no probative evidence of any kind proffered.

(c) *Lariam*

As his last mental health defense, Mezvinsky claims that he "has suffered from a Lariam-induced toxic encephalopathy" as a result of his taking the drug "during his travels to the African continent."

As to this point, only Dr. Brodie concluded that it was *possible* that the toxic encephalopathy that *may* exist in Mezvinsky's brain was somehow related to Mezvinsky's ingestion, over three years in the 1990s, of mefloquine, sold under the trade name Lariam. Dr. Brodie, however, hastened to admit that his was only a hypothesis as no study exists as to whether Lariam use can in fact cause toxic encephalopathy—indeed, Mezvinsky's is the *only* PET scan Dr. Brodie has even seen of someone who had used Lariam. Both experts on PET confirmed that no study exists about the effect of Lariam on brain activity as it can be detected in PET scans.

As to the *Pohlot* issue, Dr. Brodie testified that it was "self-evident" that the PET scans said nothing about Mezvinsky's capacity to lie about any subject. Indeed, on redirect examination, Dr. Brodie testified that there was *no* correlation between what he has seen in Mezvinsky's PET scan with Mezvinsky's capacity to deceive.

Mezvinsky now seems to argue that his Lariam use exacerbated his bipolar disorder. Although Dr. Sachs, for example, testified that Lariam does not *cause* bipolar disorder,[25] Dr. Mills suggested that it may make it worse.

**23.** D.D. Langleben, L. Schroeder, J.A. Maldjian, R.C. Gur, S. McDonald, J.D. Ragland, C.P. O'Brien, and A.R. Childress, *Brain Activity during Simulated Deception: An Event–Related Functional Magnetic Resonance Study,* 15 *NeuroImage* 727 (2002). Dr. Brodie was unaware of this research. As scientific inquiry in this realm is therefore in its infancy, Judge Boudin's comment in *Schneider*—"this

is an area in which everyone is still learning", *id.* 111 F.3d at 203—here constitutes an understatement.

**24.** *See* N.T. at 137–40 (Mar. 15, 2002).

**25.** "I don't think Lariam causes bipolar disorder. I think Lariam can perhaps for some circumscribed period of time, if you're intoxi-

This last point was one that was hotly debated in the hearing. Dr. Hans O. Lobel, a physician with the Center for Disease Control who has consulted with many international agencies such as the World Health Organization on the subject of malaria, is certainly one of the world's pre-eminent experts on malaria epidemiology. In that capacity, he had complete familiarity with the literature on the effects of mefloquine/Lariam versus chloroquine, the latter having been the chief anti-malarial drug used after World War II. Dr. Lobel testified that by the early 1980s, many areas of the malaria-infested world became resistant to chloroquine, and thus mefloquine was developed by the United States Army and approved for use in Europe in 1986 and in the United States in 1989. It is a hugely successful anti-malarial drug.

Dr. Lobel testified that no study exists linking mefloquine to psychosis, cerebral toxicity or even to irrational decisions. One such study was conducted by the University of Zurich and involved a universe of 150,000 people.[26] What some research has shown, however, is that there are certain short-term effects on some travellers, although the causal relationship is, in Dr. Lobel's view, far from established.[27]

Dr. Mills testified solely on the strength of Dr. Croft's unauthenticated report. While taking Lariam's psychological effects as more established than Dr. Lobel did, Dr. Mills nevertheless acknowledged that those effects were short-lived and would not continue over a period of years, much less over the twelve at issue here.[28]

Again, no expert suggested mefloquine/Lariam had anything to do with the capacity to deceive. To the contrary, Dr. Lobel, by far the most eminent of the experts to testify on this subject, was aware of no reliable evidence that in any way suggests that mefloquine makes anyone more likely to think that the false is true and the true, false.[29] We heard no

cated with it, cause an episode." N.T. at 290 (Apr. 9, 2002).

26. N.T. at 18–30 (Mar. 15, 2002).

27. As Dr. Lobel put it in colloquy with us about anecdotal accounts mentioned in Dr. Croft's unauthenticated report:

A No, it doesn't mean anything. Because it may be caused by things that have nothing to do with the drug.

And especially in people who travel, and unless—mefloquine is only used by people who travel, or live in the tropics overseas.

Travel apparently can be quite a stressful experience. Psychotic events are reported not infrequently among travellers. It's probably in combination of stress factors caused by the travel, strange diet, jet lag, use of alcohol—travellers tend to drink much more—and then strange environment. Some people feel it liberating, being away from social restraints that exist in a home environment.

But it's really remarkable that people—for me at least—that people find it stressful.

THE COURT: So, your testimony is that that happens if they take nothing.

THE WITNESS: Oh, absolutely.

THE COURT: O.K. Just the she[e]r fact of travel.

THE WITNESS: Has nothing to do with the drug or anything. It's just the fact of travel, and all the factors that go into a strange environment. Having to worry about this, that and the other, that apparently provokes all this.

Id. at 25–26.

28. Dr. Mills, the apostle of Mezvinsky's Lariam-exacerbation theory, stressed in his colloquy with us that Mezvinsky's mental impairment did not render him incompetent to defend himself.

29. See, e.g., N.T. at 86 (Mar. 15, 2002):

Q And, most importantly, with regard to the question of intent to deceive. Whether mefloquine can affect somebody's intent to tell a lie.

Am I correct that in this study [comparing Lariam with Malarone], there's no mention of anybody suffering a tendency to fraud or to mendacity as a result of taking the drug?

defense witness contradict Dr. Lobel on this crucial point.[30]

Mezvinsky's Lariam defense therefore constitutes yet another instance that will not pass muster under *Pohlot*, much less under Rule 403.

### Conclusion

Upon careful scrutiny, Mezvinsky's proffered mental health defenses are founded upon a miasma of ifs, hypotheses and conjectures that have no relevance to the mental state Mezvinsky disclaims for the twelve years at issue here. His experts cite nothing reliable from which a jury might link Mezvinsky's PET-identified brain abnormalities and Lariam ingestion to his capacity to deceive.

In the end, the Insanity Defense Reform Act, *Pohlot* and Rule 403 exist to prevent juries from being conned with impressive-sounding but irrelevant or misleading testimony such as that to which we were subjected here. This end does not "abrogate Mr. Mezvinsky's Constitutionally-protected right to trial by jury." [31] To the contrary, it assists the jury in its arduous task of finding the truth.

We shall therefore grant the Government's motion.

A That's right.
Q So, even with this study more particularly called to your attention, is your testimony still the same. That we still don't have any scientific evidence regarding the causal link between mefloquine and a person's intent to make a false statement?
A That's right.

**30.** Dr. Croft having disappointed Mezvinsky by his failure to appear on May 14, the defendant thereafter resorted to a bit of character assassination of Dr. Lobel. In a motion filed two days before the Government's reply was due to Mezvinsky's brief, the defense asserted that Dr. Lobel was something of a polluted source. As authority for this serious charge, Mezvinsky attached a United Press Interna-

### ORDER

AND NOW, this 3rd day of June, 2002, upon consideration of the Government's motion to exclude mental health defense (docket no. 62), defendant's response to that motion, and the Government's reply to the defendant's response, and after hearings on the motion, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the Government's motion is GRANTED.

tional dispatch that quotes none other than Dr. Croft. Mezvinsky's twelfth-hour motion overlooks the fact that Mr. Bergstrom, in searching cross-examination and recross-examination, painstakingly questioned Dr. Lobel on the very effects mentioned in the U.P.I. story. *See* N.T. 46–79, 88–94 (Mar. 15, 2002). Indeed, Dr. Lobel's testimony even anticipated the reports from Marines in Somalia mentioned in the U.P.I. story, *see id.* at 64. Any further questioning of Dr. Lobel would therefore only beat a dead horse on what is manifestly a meritless defense. We therefore deny the motion in a separate order.

**31.** Def't's Opp. to Gov't's Mtn. at 2.